IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CATHLEEN CHINDERLE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 10 C 0618 |
| v. ) | |
| ) | Magistrate Judge Nan R. Nolan |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Cathleen Chinderle filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and have filed cross-motions for summary judgment. For the reasons stated below, this case is remanded for further proceedings consistent with this opinion.

## I. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI") under Titles II and XVI of the Act, a claimant must establish that he or she is disabled within the meaning of the Act.[1] *York v. Massanari,* 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001); *Keener v. Astrue*, 2008 WL 687132, at *1 (S.D. Ill. 2008). A

---
[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*.

person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?

2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?

3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?

4. Is the claimant unable to perform his or her former occupation?

5. Is the claimant unable to perform any other work?

*See* 20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

## II. PROCEDURAL HISTORY

Plaintiff applied for SSI on July 14, 2006, alleging that she became disabled on March 27, 1998, due to head and neck injuries and mental illness. (R. at 59, 124,

138, 143.) The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing.[2] (*Id.* at 54, 55, 59, 67–71, 83–86, 89.)

On April 8, 2008, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge ("ALJ"). (R. at 5, 9–38, 59.) The ALJ also heard testimony from David L. Biscardi, Ph.D., a medical expert ("ME") and Thomas F. Dunleavy, a vocational expert ("VE"). (*Id.* at 5, 35–52, 59, 108, 110.)

The ALJ denied Plaintiff's request for benefits on February 27, 2009. (R. at 59–66.) Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since February 29, 2004.[3] (*Id.* at 61.) At step two, the ALJ found that Plaintiff's has the following severe impairments: schizoaffective disorder, mood disorder, and history of substance abuse. (*Id.*) At step three, the ALJ determined that Plaintiff's impairments meet Listings 12.09 and 12.04. (*Id.* at 63.) However, the ALJ found that if Plaintiff stopped substance abuse, her impairments or combination of impairments would not meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.*)

---

[2] Plaintiff filed a prior SSI application on February 29, 2004, which was denied but not appealed past the reconsideration level. (R. at 59, 124, 138–39.)

[3] Under Title XVI, eligibility for SSI benefits begins in the month during which the application is filed. 20 C.F.R. § 416.335; *see Browning v. Astrue*, 2008 WL 835702, at *7 (N.D. Ind. March 24, 2008). The ALJ's decision determined the issue of disability with respect to the filing date of the prior application because of the possibility of reopening the prior application if good cause found. (R. at 59, 61); *see* 20 C.F.R. §§ 416.1487, 416.1489.

The ALJ then assessed Plaintiff's residual functional capacity ("RFC")[4] and determined that if Plaintiff stopped substance abuse, she would have the RFC to understand, remember, and carry out unskilled, simple, repetitive, and routine tasks. (R. at 64.) Plaintiff has no past relevant work (step four). (*Id.* at 65.) At step five, based on Plaintiff's RFC, her vocational factors and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including work as an assembler and a packager. (*Id.* at 65–66.) Accordingly, because Plaintiff would not be disabled if she stopped substance abuse, the ALJ found that her substance abuse is a contributing factor material to the determination of disability. (*Id.* at 66.) Thus, the ALJ concluded that Plaintiff is not considered disabled as defined by the Act. (*Id.*)

The Appeals Council denied Plaintiff's request for review on December 2, 2009. (R. at 1–4.) Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in gen-

---

[4] "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

eral, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. DISCUSSION

Plaintiff raises two arguments in support of her request for reversal and remand: (1) the ALJ erred in finding substance use material to Plaintiff's disability; and (2) the ALJ erred in failing to send Plaintiff for a post-hearing consultative ex-

amination. (Mot. 2.) Specifically, Plaintiff contends that the ALJ's decision that substance abuse was "material" to her disability was not supported by substantial evidence. (*Id.* 11–12.) Plaintiff also faults the ALJ for failing to develop the record by sending her to a post-hearing consultative examination as recommended by the ME. (*Id.* 12–13.)

**A. Applicable Law**

A person who is otherwise disabled cannot receive SSI or DIB benefits if alcoholism or drug addiction is a "contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). Thus, "[w]hen an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the administrative law judge is whether, were the applicant not a substance abuser, she would still be disabled." *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006); *see* 20 C.F.R. § 404.1535(b)(1) ("The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol."). If the ALJ finds that the claimant would still be disabled if she stopped using drugs or alcohol, "she is deemed disabled 'independent of [her] drug addiction or alcoholism' and is therefore entitled to benefits." *Kangail*, 454 F.3d at 629 (quoting 20 C.F.R. § 404.1535(b)(2)(ii)).

**B. Medical Evidence**

On February 21, 2005, Plaintiff was admitted to Tinley Park Mental Health Center, after she was found wandering in the street, shouting at cars, speaking in-

coherently and acting in a hostile manner. (R. at 208, 221, 233.) She had drug paraphernalia on her person, tested positive for cocaine, and acknowledged a history of alcohol abuse. (*Id.* at 221–22, 229, 233.) On admission, Plaintiff exhibited signs of depression, manic psychosis, and paranoia, with a dysphoric mood and a flat affect. (*Id.* at 221, 223.) She was diagnosed with psychotic disorder NOS, mood disorder NOS, alcohol and cocaine abuse, rule out bipolar disorder with psychosis, rule out major depression with psychosis, and history of substance induced mood disorder. (*Id.* at 219.) During her stay at Tinley Park Mental Health Center, she was also diagnosed with psychosis—cocaine induced vs. intoxication, bipolar with or without psychosis, and depression with or without psychosis. (*Id.* at 234). Plaintiff was assigned a Global Assessment of Functioning ("GAF") score of 30–35.[4] (*Id.* at 219.) Plaintiff was discharged on March 4, 2005, and advised to follow up with the Will County Mental Health Center (*id.* at 208), which Plaintiff testified she did (*id.* at 21).

---

[4] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev. 2000) (hereinafter DSM-IV). A GAF score of 21–30 indicates that behavior is considerably influenced by delusions or hallucinations or serious impairment, in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends). *Id.* at 34. A GAF score of 31–40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *Id.*

Plaintiff was admitted to the Will County Adult Detention Facility around September 2005 on drug charges.[5] (R. at 18–19, 384; *see id.* at 62.) During her eleven months in jail, she was referred for a psychological evaluation, which was performed on November 27, 2005. (*Id.* at 19, 360.) Although the jail records are difficult to decipher, it appears that Plaintiff was diagnosed with mood disorder NOS, rule out bipolar disorder, psychotic disorder NOS, and schizophrenia, which were treated with Risperdal.[6] (*Id.* at 360, 373–75; *see id.* at 382.) She was also diagnosed with depression, which was treated with Remeron and Trazadone. (*Id.* at 353–55, 358, 379–80.)

Shortly after she was released from jail in July 2006, Plaintiff began treatment with Will County Health Department ("WCHD"), which she continued through the date of the hearing. (R. at 16, 22–23, 273, 324–45, 349–51.) On July 17, 2006, WCHD conducted a clinical assessment, finding that Plaintiff was somewhat distractible, had limited insight, confused thought process, impaired memory, impulsive and irritable behavior, paranoid delusions, anxious, angry and irritable mood, and blunted affect. (*Id.* at 276.) She was diagnosed with psychotic disorder NOS, alcoholic dependence in sustained partial remission, cocaine abuse in sustained full remission, and rule out alcohol induced psychotic disorder. (*Id.* at 278.) Plaintiff was assigned a GAF score of 40. (*Id.*)

---

[5] The records from Will County Adult Detention Facility were not submitted until after the hearing. (*See* R. at 59, 352–84.)

[6] Risperdal is an antipsychotic medication used to treat the symptoms of schizophrenia, mania, and mixed episodes. MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginformation.html (last accessed Sept. 6, 2011) (hereinafter MedlinePlus).

WCHD conducted a psychiatric evaluation on August 9, 2006.[7] (R. at 271–72.) Plaintiff was diagnosed with a dysthymic disorder, psychosis NOS, and polysubstance abuse, and assigned a GAF score of 70.[8] (*Id.* at 272.) She was prescribed Seroquel and Effexor for her psychiatric conditions.[9] (*Id.*)

On August 26, 2006, William N. Hilger, Ph.D., conducted a consultative examination on behalf of the Commissioner. (R. at 288–91.) Prior to the examination, the only medical records reviewed by Dr. Hilger was the psychiatric evaluation conducted by WCHD on August 9, 2006. (*Id.* at 288.) Dr. Hilger found Plaintiff to have fair memory, fair knowledge, minimal to poor calculational ability, minimal to poor conceptual reasoning, minimal abstract reasoning, and poor judgment. (*Id.* at 290.) He diagnosed her with a history of polydrug dependence; dysthymic disorder, minimally treated; low average intellectual functioning; and personality disorder with antisocial features NOS. (*Id.* at 291.) Nevertheless, Dr. Hilger concluded that Plaintiff "appears to have fair mental potential if she were to stay away from drugs and alcohol and other illicit activities to perform work related activities involving understanding and memory, sustained concentration and persistence, social interaction, and adaption." (*Id.*)

---

[7] It is not clear from the record whether the evaluation was conducted on August 9 or August 19. (*Compare* R. at 271 *with id.* at 63.)

[8] A GAF score of 61–70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. DSM-IV at 34.

[9] Seroquel is an antipsychotic medication used to treat schizophrenia, mania, and depression in patients with bipolar disorder. Effexor is used to treat depression, anxiety disorder, and panic disorder. *See* MedlinePlus.

On October 31, 2006, Carl Hermsmeyer, Ph.D., a nonexamining state-agency consultant, reviewed Plaintiff's records and concluded that she had mild restriction of activities of daily living and moderate difficulties in both maintaining social functioning and in maintaining concentration, persistence, or pace. (R. at 291, 304.) He found her moderately limited in the ability to understand, remember, and carry out detailed instructions, and in the ability to maintain attention and concentration for extended periods. (*Id.* at 308.) Dr. Hermsmeyer observed that Plaintiff had a history of substance abuse with a diagnosis of dysthymic disorder and personality disorder with antisocial features NOS. (*Id.* at 306.) He concluded that Plaintiff's symptoms did not meet the listings and that she was capable of carrying out simple one and two-step tasks at a consistent pace. (*Id.* at 306, 310.) On March 20, 2007, Jerrold Heinrich, Ph.D., agreed with Dr. Hermsmeyer's assessments. (*Id.* at 312–14.)

On August 15, 2007, Larry Kravitz, Psy.D., an ME, reviewed the records and answered some interrogatories at the ALJ's request. (R. at 315–20.) Dr. Kravitz identified Plaintiff's mental impairments as psychosis NOS, dysthymic disorder, NOS, polysubstance abuse in early partial remission, and personality disorder with antisocial features. (*Id.* at 316.) He opined that Plaintiff's impairments did not meet or equal any of the listings but found that they did cause functional limitations. (*Id.* at 317–18.) Dr. Kravitz concluded that Plaintiff would have mild restrictions in activities of daily living, moderate restrictions in social functioning, and mild to moderate restrictions in maintaining concentration, persistence or pace. (*Id.* at 317.) In his opinion, these restrictions would not change if Plaintiff stopped using drugs or alco-

hol. (*Id.*) Dr. Kravitz concluded that Plaintiff "would be able to mentally manage simple, routine work tasks given an environment where interpersonal contacts were only brief and superficial and where levels/types of stress were routine and predictable." (*Id.* at 319.)

On February 6, 2008, WCHD conducted a psychiatric evaluation. (R. at 322–23.) The WCHD psychiatrist observed that Plaintiff had rigid and paranoid thought processes; was irritable, angry, labile, and distracted; exhibited poor insight and erratic judgment; and had a distorted fund of knowledge. (*Id.* at 323.) The psychiatrist diagnosed Plaintiff with schizoaffective disorder and alcohol and cocaine dependence, and assigned her a GAF score of 50 or 55.[10] (*Id.*) The doctor increased Plaintiff's dosage of Seroquel and continued her on Effexor. (*Id.*)

Dr. Biscardi testified at the hearing as an ME. He found Plaintiff credible and stated that her demeanor at the hearing was consistent with a mental impairment, in addition to the effects of drugs and alcohol. (R. at 41.) He opined that although Plaintiff was clearly under the influence when she was admitted to Tinley Park Mental Health Center, it was difficult to determine whether the drugs and alcohol were material to her mental impairment. (*Id.*) He observed that despite a period of detoxification during her hospital stay, she was referred for additional mental heath treatment upon her release. (*Id.*)

---

[10] A GAF score of 41–50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV at 34. A GAF score of 51–60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

Based on the ME's review of the available medical records and his observation of Plaintiff at the hearing, he agreed with WCHD that Plaintiff has a schizoaffective disorder. (R. at 43.) He opined that without drugs and alcohol, her mental impairment is severe and causes moderate to marked deficits in social functioning; marked deficits in concentration, persistence and pace; and moderate deficits in activities of daily living. (*Id.*) The ME concluded that with drugs and alcohol, Plaintiff is precluded from sustained performance of even simple, routine work. (*Id.* at 44.)

Nevertheless, the ME cautioned the ALJ that it was difficult to determine how material the drugs and alcohol were to Plaintiff's impairments. (R. at 41, 42, 44.) Specifically, the ME testified that he would like to review the records from Plaintiff's mental health treatment in jail because they would reflect her symptoms in the absence of drugs and alcohol and aid him in determining the materiality of drugs and alcohol to Plaintiff's mental impairments. (*Id.* at 42, 44.) He also recommended a current evaluation of Plaintiff's cognitive functioning, including IQ and memory testing. (*Id.*)

**C. Analysis**

In her decision, the ALJ found that as of Plaintiff's admission to Tinley Park Mental Health Center, her mood and substance abuse disorders were so severe that they met the criteria of Listings 12.04 and 12.09. (R. at 63.) The ALJ determined that Plaintiff had moderate restriction of activities of daily living; marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace; and one period of decompensation. (*Id.*) However, the ALJ

concluded that substance abuse was material to the finding of disability. (*Id.* at 63–65.)

Under the circumstances, none of the reasons provided by the ALJ for finding Plaintiff's substance abuse material to her disability are legally sufficient or supported by substantial evidence. First, the ALJ selectively chose evidence that supported her findings while ignoring contrary evidence. *See Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion."). While the ME noted that Plaintiff had periods of time where she appeared "stable" (R. at 40, 41), the ALJ failed to note that the ME was adamant that he could not determine materiality without additional information from Will County Adult Detention Center (*id.* at 38–39, 41, 42). In fact, the ME stated that if Plaintiff was treated for a severe mental impairment while she was in jail, it was likely that drugs and alcohol were not material to her symptoms. (*Id.* at 42.) The ALJ also failed to acknowledge that the ME encouraged the ALJ to obtain a current evaluation of Plaintiff's cognitive functioning, including IQ and memory testing, before deciding the materiality issue. (*Id.*)

Similarly, the ALJ emphasized that Plaintiff's GAF had improved from 30–35 in February 2005 to 70 in August 2006 (*id.* at 64), but failed to discuss that her GAF had dropped down to 50–55 by February 2008 (*id.* at 322–23). By cherry-picking MCHD's records, the ALJ demonstrated a fundamental misunderstanding of mental illness; a person who suffers from mental illness will have better days and worse

days. *See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) ("But by cherry-picking Dr. Mahmood's file to locate a single treatment note that purportedly undermines her overall assessment of Punzio's functional limitations, the ALJ demonstrated a fundamental, but regrettably all-too-common, misunderstanding of mental illness. As we have explained before, a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition.") (citations omitted); *see also Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010) ("A GAF rating of 50 does not represent functioning within normal limits. Nor does it support a conclusion that Campbell was mentally capable of sustaining work."). That Plaintiff's mental impairments have fluctuated over time does not mean that her substance abuse was material to her disability. *See Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job."); *Strocchia v. Astrue*, 2009 WL 2992549, at *17 (N.D. Ill. 2009) ("Dr. Dwivedi's notes show that Plaintiff's symptoms, mood and functioning varied between visits, and there were days when Dr. Dwivedi's observations of Plaintiff corresponded with the observations of the other medical sources. The differences in reported frequency, intensity, and limiting effects of these symptoms do not automatically indicate inconsistency, but instead should be expected in the course of ongoing treatment.") (citing

*Bauer*, 532 F.3d at 609). Further, the ALJ cited Dr. Kravitz's opinion that Plaintiff could manage simple, routine work tasks (R. at 65), but failed to acknowledge that Dr. Kravitz explicitly found that Plaintiff's substance abuse was *not* material to her mental impairments (*id.* at 317). *See Campbell*, 627 F.3d at 306 ("An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability.").

Second, there is significant medical evidence indicating that Plaintiff's substance abuse was *not* material to the determination of Plaintiff's disability. During her eleven months in jail, when she was not using drugs or alcohol, she was diagnosed with depression, mood disorder NOS, rule out bipolar disorder, psychotic disorder NOS, and schizophrenia, and prescribed both antipsychotic and antidepressant medications. (R. at 353–55, 358, 360, 373–75, 379–80; *see id.* at 382.) As the ME opined, "if [the jail] records indicate that [Plaintiff] was treated for a severe mental impairment while she was in jail, in the absence of drugs and alcohol, then I think we need to give more credence to the likelihood that drugs and alcohol are not material to her symptoms, and that her symptoms are present, in spite of the history of that." (*Id.* at 42.) The jail's diagnosis was supported by WCHD. Within a couple of weeks after Plaintiff was released from jail, WCHD conducted a clinical assessment and diagnosed psychotic disorder NOS, alcoholic dependence in sustained partial remission,[11] cocaine abuse in sustained full remission, and rule out alcohol induced psychotic disorder, and assigned a GAF score of 40. (*Id.* at 278.) Further, although

---

[11] Plaintiff acknowledged having two beers after her release from jail. (R. at 274.)

Plaintiff went through a period of detoxification during her stay at Tinley Park Mental Center, she was still referred for mental health treatment after her release. (*Id.* at 208.)

The Commissioner contends that the ALJ's opinion was supported by Dr. Hilger's consultative examination in August 2006. (Resp. 4–5). Dr. Hilger opined that Plaintiff "appears to have fair mental potential if she were to stay away from drugs and alcohol and other illicit activities to perform work related activities involving understanding and memory, sustained concentration and persistence, social interaction, and adaption." (R. at 291.) The ALJ, however, did not cite Dr. Hilger's opinion in her materiality discussion. (*See id.* at 63–65.) Thus, Defendant "violated the *Chenery* doctrine (*see SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943)), which forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

In any event, Dr. Hilger's opinion is deserving of minimal weight. He spent only one hour with Plaintiff after reviewing a single medical record. (R. at 288.) The Court is troubled that the only record provided to Dr. Hilger was the WCHD psychiatric evaluation conducted in August 2006, which assigned a GAF score of 70. (*Id.* at 272, 288.) Dr. Hilger was not provided with the records from Tinley Park Mental Health Center or the July 2006 WCHD clinical assessment, which assigned a GAF score of 40. (*See id.* at 208–53, 276–78.) A person suffering from a serious mental impairment will have good days and bad days; a snapshot of a single day says little about her overall condition. *Punzio*, 630 F.3d at 710.

Further, none of the medical providers, including Dr. Hilger and the doctors cited by the ALJ in her materiality discussion, were afforded the opportunity to review the medical records from Will County Detention Center. These records, which indicated that Plaintiff suffers from depression, mood disorder NOS, psychotic disorder NOS, and schizophrenia in the absence of drugs and alcohol (R. at 353–55, 358, 360, 373–75, 379–80), were critical to determining whether substance abuse was material to her mental impairments. By discounting the effect that the medical records from Will County Detention Center have on the issue of materiality without the benefit of any doctor's review of those records, the ALJ committed reversible error. *See Rohan v. Chater*, 98 F.3d 966, 968 (7th Cir. 1996) ("As this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."); *Clifford*, 227 F.3d at 870 ("An ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record.").

**D. Summary**

In sum, the ALJ has failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (citation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not legally sufficient or supported by substantial evidence. On remand, the ALJ shall send Plaintiff for a current consultative examination to evaluate her cognitive functioning, including IQ and memory testing. The consultative

examiner shall be provided with a copy of all relevant records. With the assistance of an ME, the ALJ shall then reevaluate whether substance abuse is material to Plaintiff's mental impairments, considering all of the evidence of record, including the medical reports from the Will County Adult Detention Facility, and shall explain the basis of her findings in accordance with applicable regulations and rulings.

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 21] is **GRANTED**, and Defendant's Motion for Summary Judgment [Doc. 24] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: September 20, 2011

*Nan R. Nolan*

NAN R. NOLAN
United States Magistrate Judge